**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KIMBERLY MOCIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:11-cv-00502** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Brown** |
| **SUMNER COUNTY EMERGENCY** | ) | |
| **MEDICAL SERVICES,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

Pending before the Court is a Motion for Summary Judgment ("Motion") (Doc. No. 19)

filed by Defendant Sumner County Emergency Medical Services ("SCEMS"). For the reasons

set forth below, the Court **GRANTS** the Motion in part and **DENIES** it in part.

**I.** **BACKGROUND**

*A.* *Factual Background*[1]

Plaintiff Kimberly Mocic worked as an EMT for SCEMS from January 2007 to

November 2010, when SCEMS terminated her employment. During that time, she worked on an

ambulance crew in SCEMS's Basic Life Services ("BLS") Division, which handles non-

emergency patient transfers between hospital facilities and brings dialysis, nursing home, and

bed-confined patients to medical appointments. BLS crews generally work in two-person teams

to lift patients into ambulances (Doc. No. 20-2 at 6), but may request lift assistance for additional

help from other emergency workers at a pick-up location or by calling into SCEMS's dispatch

(Doc. No. 25-4 at 8). Dispatch requests generally occur when a crew must transport an obese

---

[1] The facts in this section are undisputed and taken from Plaintiff's Response to Defendant's
Statement of Undisputed Facts (Doc. No. 26), unless otherwise indicated.

patient or must carry a patient up or down many stairs. (*Id.*; Doc. No. 25-3 at 9.) A different

SCEMS division, Advanced Life Support ("ALS"), handles SCEMS's emergency calls.

On September 16, 2009, Mocic requested intermittent leave for sickness related to her

pregnancy. Operations Manager Rick Moore, who handled Mocic's requests for Family and

Medical Leave Act ("FMLA") and maternity leave, approved the request on October 1, 2009.

Mocic used intermittent FMLA leave until November 5, 2009, when her doctor diagnosed Mocic

with preterm labor complications and completed a disability claim. Mocic then took full-time

leave after Moore submitted paperwork for her to receive short-term disability benefits,

indicating in the papers that she would return to work after her baby's birth.

On January 4, 2010, Mocic filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC"), alleging that two supervisors—Captain John Michael Poss

and Moore—discriminated against her on the basis of her pregnancy. (Doc. No. 20-1 at 30.)

She alleged that Poss, the supervisor responsible for employee compliance with SCEMS's

uniform policy, "harassed [her] on a regular basis for not having [her] shirt tucked in." (*Id.*) In

the charge, she alleged that she could not tuck in her shirt due to her pregnancy, and that Poss

told her, "[y]ou should have thought of that before you got pregnant." (*Id.*) SCEMS has a

written uniform policy that requires employees to tuck in their uniform shirts.

Mocic's charge also alleged that Moore told her that, if she took the four weeks of

maternity leave available under state law in excess of the twelve weeks of FMLA leave, then

whether she would have a job when she returned "depended on how they felt." (*Id.*) Mocic

testified that Moore said this in August 2009 and that he also told her she "should have thought

about [having a job when she returned] beforehand." At deposition, Moore acknowledged that

the conversation took place, and testified that "out of desperation" he told her, "I guess [whether

you have a job] would depend on whether or not we liked you[,] and you have to know that I do."

In addition, Mocic's charge alleged SCEMS had denied her light duty work, which her doctor had recommended on November 5, 2009, because of the complications with her pregnancy. (*Id.*) By contrast, she alleged, SCEMS had allowed male employees with on-the-job injuries to work light duty for longer than twelve to sixteen weeks and afterward to return to full-time jobs. (*Id.*) Mocic testified that she was not aware of any employees who worked light duty between October 2009 and November 2010.

Mocic returned to work in March 2010 with no restrictions. (Doc. No. 20-1 at 25.) In August 2010, she suffered an on-the-job shoulder injury while lifting a 350-pound patient. (*Id.*) After the injury, Mocic requested light duty work, but Moore told her SCEMS had no light duty available and placed her on leave with worker's compensation benefits for September and October 2010. (*Id.* at 26–27.)

When Mocic returned in late October 2010, she was paired with a male partner, Jerry Denton. In November 2010, Denton suffered an off-duty injury, and Dwayne Patrick—the BLS Division's supervising lieutenant—told Mocic that he might have to pair her with a female partner in Denton's absence. Mocic's response to Patrick is disputed. According to Patrick, Mocic told him that, if Patrick paired her with a female partner, Mocic would require lift assistance for every call because of her shoulder injury. (Doc. No. 20-7 at 7.) Mocic denies this. According to her, she told Patrick that she would require lift assistance only with obese patients. (Doc. No. 25-9 ¶ 5–6.) The same day, Patrick reported to Moore that Mocic told him she would require lift assistance on every call if partnered with a woman. (Doc. No. 20-7 at 7.)

On November 12, 2010, SCEMS terminated Mocic's employment. SCEMS Director Keith Douglas testified that he made the decision to terminate, based on a recommendation by Moore. (Doc. No. 20-2 at 11–12.)

### B. Procedural Background

Mocic filed her Complaint against SCEMS on May 27, 2011 (Doc. No. 1), and SCEMS filed its Motion for Summary Judgment (Doc. No. 19) on September 28, 2012, along with a Memorandum in Support (Doc. No. 20), various depositions and unpublished cases (Doc. Nos. 20-1 to 20-13; 24-1), and a Statement of Undisputed Facts (Doc. No. 21). On November 2, 2012, Mocic filed a Response (Doc. No. 25) with attached depositions and cases (Doc. Nos. 25-1 to 25-10), to which SCEMS filed a Reply (Doc. No. 27) with an attached case (Doc. No. 27-1) on November 14, 2012.

## II. STANDARD OF REVIEW

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for

summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III.    ANALYSIS

Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012). As amended by the Pregnancy Discrimination Act, this includes discrimination because of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k) (2012). As a result, pregnancy claims are "analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (citations omitted).

Similarly, the Tennessee Human Rights Act ("THRA") proscribes discriminatory employment practices on the basis of pregnancy, with respect to the compensation, terms, conditions, or privileges of employment. *Spann v. Abraham*, 36 S.W.3d 452, 462–63 (Tenn. Ct. App. 1999); Tenn. Code Ann. § 4-21-401(a)(1) (2010). Tennessee courts have held that the state legislature "intended the THRA to be coextensive with federal law," and thus they look to federal decisions construing Title VII when analyzing claims under the THRA. *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 834–35 (Tenn. 1997), *overruled on other grounds by Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999).

Here, Mocic has set forth multiple claims against SCEMS under both Title VII and the THRA for discrimination related to her pregnancy. Having now withdrawn several state claims included in the Complaint (Doc. No. 25 at 1 n.1), Mocic proceeds with six claims at the summary judgment stage: (1) a Title VII sex discrimination claim based on a hostile work environment; (2) a Title VII sex discrimination claim based on SCEMS's refusal to allow Mocic to deviate from its uniform policy or to provide her a proper uniform during her pregnancy; (3) a Title VII sex discrimination claim based on SCEMS's refusal to provide Mocic with light duty; (4) a Title VII retaliation claim based on SCEMS's refusal to assign her light duty and her termination; and (5) sex discrimination and (6) retaliation claims under the THRA, based on the same grounds as her Title VII retaliation and light duty sex discrimination claims. (Doc. No. 1 ¶ 19–35.) Because Mocic's two THRA claims mirror two of her Title VII claims, the Court analyzes the THRA and Title VII claims together, reaching the same conclusion for both.

A.  *Hostile Work Environment*

First, Mocic alleges SCEMS subjected her to a hostile work environment, based on harassing and embarrassing comments related to her pregnancy. (Doc. No. 1 ¶ 21.) SCEMS argues in its Motion that, while statements made by its supervisors may have been inappropriate

or insensitive, they were not sufficiently pervasive to create a hostile work environment, as a matter of law.  (Doc. No. 20 at 8–11.)

An employee may establish her employer violated Title VII by creating a hostile or abusive work environment, if the employee "show[s] that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (citations omitted).  A "basic tenet" of this type of cause of action is that it is reviewed by the court based on the totality of the circumstances, such that a court must consider the work environment as a whole and all the alleged incidents of harassment by all perpetrators for their cumulative effect.  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562–63 (6th Cir. 1999).

Here, SCEMS does not challenge that Mocic—as a woman—is a member of a protected class, was subjected to unwanted harassment, or that SCEMS would be liable for the sex discrimination of its supervisor staff.  Instead, it challenges the third and fourth elements of her claim, arguing that the alleged harassment was not based on sex and did not constitute a hostile work environment.  The Court addresses these in turn, after describing the evidence.

1.    Evidence of Sex Discrimination

To begin, the Court finds Mocic has set forth evidence of multiple incidents of harassing conduct and comments to support her claim.  First, Mocic alleged in her Complaint and EEOC charge that Poss denied her request in June 2009 to order a larger uniform for her pregnancy, saying that "she 'should have thought about the uniform [problems] before she got pregnant.'" (Doc. Nos. 1 ¶¶ 7–8; 20-1 at 30.)  This was supported by the deposition testimony of another supervisor, Vincent Riley, who testified that Mocic had complained about the comment to him

(Doc. No. 20-10 at 3) and, while he did not investigate whether Poss made comment, he encouraged Poss to order the uniform (*Id.* at 6).[2]

Next, several witnesses testified to subsequent comments by Poss regarding Mocic's non-compliance with SCEMS's uniform policy. Mocic's co-worker Kristin Meece observed "at least" one incident when Poss told Mocic to tuck in her shirt (Doc. No. 20-11 at 5), which several witnesses noted Mocic could not do during her pregnancy because she showed early, could not zip up her pants, and had to wear an elastic band covering the zipper (*id.*; Doc. No. 25-5 at 4–6). Mocic testified that "anytime we would walk across the parking lot," Poss would "start harassing [her] over the uniforms." (Doc. No. 20-1 at 4.) She also testified that Poss kicked her chair "multiple times" when she sat with co-worker Jessica Garner, and that he would "tell [her] he was going to write [her] up for being out of uniform or tell [her] that [she] needed to have [her] shirt tucked in." (*Id.* at 7.) Garner confirmed this, testifying that at least once Poss had approached Mocic from behind and kicked the back of Mocic's chair—startling her such that her feet landed on the ground to stabilize her—and threatened to write up Mocic for a uniform violation for wearing her shirt untucked. (Doc. No. 25-5 at 4–5.)

Mocic also testified that Moore made an "inappropriate" comment about her pregnancy during an August 2009 conversation, when she asked him whether she could return to her job after her maternity leave, and he responded that it "would depend on how he felt" and that "[Mocic] should have thought about that beforehand." (Doc. No. 20-1 at 1–6, 24.) Garner testified that she overheard Moore make this statement. (Doc. No. 25-5 at 7.) In deposition, Moore did not deny the conversation occurred or that he made inappropriate comments, but

---

[2] While Mocic has alleged a second Title VII claim based on SCEMS's refusal to provide her with a larger uniform or to allow her to deviate from its uniform policy during her pregnancy, the Court finds this alleged statement by Poss supports Mocic's claim of a hostile work environment based on "embarrassing and harassing statements regarding her pregnancy." (Doc. No. 1 ¶ 21.)

testified he told Mocic that whether she would have a job "would depend on whether or not we liked [ Mocic]." (Doc. No. 20-4 at 10.) He testified that he had been "getting a little frustrated" that Mocic had "asked him the same things over and over again," and made the comment "out of desperation." (*Id.* at 9–10.)

In addition to these specific incidents with supervisors, Garner testified to SCEMS's general culture, as it related to female employees. She testified that Mocic received "constant comments . . . about . . . being out of uniform"—such as, "I wish I could untuck my shirt"—that appear to have come from other employees. (Doc. No. 25-5 at 11.) She also testified to a de facto separation between SCEMS's male employees, who stayed inside the station on the couches or in beds during their down time, and the women in the department, who sat together in the outside bay area. (*Id.* at 13.) In explaining what prompted her to stay outside, Garner testified that when she attempted to enter the station to rest, a male employee had told her "Why are you sitting down, you don't do nothing," which made her uncomfortable entering the station. (*Id.* at 13.) She stated that employees of the BLS division were treated as second-class citizens, and that she heard comments by male employees such as "Get out there and do that bitch work," referring to the work of the division. (*Id.* at 12.) Lastly, Garner testified to an incident that she witnessed and reported to supervisors where a female paramedic was shot at with an air rifle by male co-workers, despite her protestations for them to stop. (*Id.* at 12.)

### 2. Gender Basis for Poss's Comments

In disputing that Mocic has met the third element of her sex discrimination claim, SCEMS argues that Mocic has failed to show evidence that Poss's comments about her tucking in her shirt were gender-based—and thus, do not contribute to evidence of gender discrimination—because Poss "treated Plaintiff the same way he treats males who do not conform with SCEMS'[s] uniform policy." (Doc. No. 27 at 2.)

The conduct underlying a hostile work environment claim need not be overtly sexual in nature to qualify as harassment "based on sex" under Title VII; rather, "[a]ny unequal treatment that would not occur but for the employee's gender" may suffice, if it creates an inference of anti-female bias. *Williams*, 187 F.3d at 565–66 (emphasis omitted); *see Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.").

Here, the Court finds that context leads to the inference that Poss's comments would not have occurred, but for Mocic's gender. Under the totality of the circumstances test, it is a mistake for a court to separate incidents and deem only some gender-based; rather, the evidence that some conduct is gender-based "permits an inference" that other abuse occurred "because of sex." *Randolph*, 453 F.3d at 734. *See Williams*, 187 F.3d at 565–66 (instances in which plaintiff was ostracized, combined with gender-specific comments, created an inference of gender-based behavior). Mocic's allegations about Poss's behavior amount to more than isolated comments about tucking in her shirt. She has alleged that Poss refused to allow her to order a larger uniform at the start of her pregnancy and that he told her she should have thought about the uniform before getting pregnant (Doc. No. 1 ¶ 8), allegations she relayed to another supervisor who testified that he fielded the complaint and attempted to help Mocic (Doc. No. 20-10 at 3, 6). Poss's alleged comment to Mocic about her pregnancy was inherently gendered and, as such, the Court cannot separate this initial motivation from his later comments and kicking of Mocic's chair. Thus, the Court finds that Mocic has raised a question of fact as to whether all of Poss's conduct evidenced a basis in her gender.

Even if the Court were to examine Poss's shirt-tucking comments in isolation, the Court could not agree with SCEMS's conclusion that Poss's comments were gender neutral as a matter

of law because Poss "treats all employees equally" (Doc. No. 27 at 2).  Defendants rely here on broad statements by supervisor Riley that Poss "is a stickler for uniforms" and "goes around and everyone should be pristine" (Doc. No. 20-10 at 4), and that Douglas once called Poss the "uniform police" (Doc. No. 20-1 at 7).  However, these statements do not establish that Poss actually treated men similarly, as they do not reveal the extent of Poss's comments to male workers.  For instance, testimony revealed only two types of comments Poss had made to other employees: general comments that an employee was wearing an outdated uniform (Doc. No. 20-11 at 4), and a specific comment made to an unidentified employee that Poss did not like the color of the employee's undershirt (Doc. No. 20-1 at 7).  Both Mocic and Meece testified that they never observed Poss tell another employee to tuck in his or her uniform, apart from Mocic. (Doc. Nos. 20-1 at 7; 20-11 at 4.)  And—just as there is no evidence Poss treated overweight men with the same uniform-size inflexibility as he did a pregnant woman—the record does not show that Poss ever kicked or threatened to write up other employees for violating any part of SCEMS's uniform policy, as he allegedly did to Mocic.  (Doc. No. 25-5 at 4.)

Thus, the Court finds Mocic has offered sufficient evidence to create a genuine dispute that all of Poss's conduct and comments to her regarding her uniform were gender-based.

### 3.       Severity or Pervasiveness of Discrimination

SCEMS also argues that Mocic has not offered evidence of sufficiently pervasive or severe discrimination to establish SCEMS created a hostile work environment, namely because she alleges only two comments in the Complaint that alone do not give rise to pervasiveness. (Doc. No. 20 at 8–9.)

A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris*

*v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).  The conduct must create an objectively and subjectively hostile work environment.  *Id.* at 21–22.  Again, the evidence is reviewed by the court on the totality of the circumstances, such that a court must consider the work environment as a whole and all the alleged incidents of harassment by all perpetrators for their cumulative effect.  *Williams*, 187 F.3d at 562–63.  Circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

Here, the Court finds that Mocic has satisfied her burden by raising a question of whether the alleged incidents, on whole, show Mocic's workplace was "so permeated with 'discriminatory intimidation, ridicule, and insult' that [wa]s 'sufficiently severe or pervasive to alter the conditions of the victim's employment,'" both objectively and subjectively.  *Id.* at 21–22.  While SCEMS focuses on Mocic's Complaint, it ignores the multiple comments and acts testified to by Mocic and her other deposed witnesses.  As stated above, these include: (1) uniform supervisor Poss's statement that he would not order Mocic a larger uniform and that she should have thought about the uniform before she became pregnant; (2) multiple subsequent comments by Poss, chiding Mocic for failing to comply with the SCEMS uniform policy; (3) multiple incidents of Poss kicking Mocic's chair, as he chided her; (4) a statement from Moore that Mocic should have thought about her job security before she became pregnant; (5) comments from other SCEMS employees about Mocic's untucked uniform and how they could not untuck their shirts; (6) an attitude among some SCEMS workers that BLS employees were "second-class citizens," as evidenced by the comment to one female employee to "Get out there and do that bitch work," and the segregation of male ALS workers in the inside of the station,

and female workers outside; and (7) an incident when a female paramedic was shot at with an air rifle by male co-workers, despite her protestations for them to stop.

In other words, Mocic has shown evidence she was the target of repeated physical and daily verbal harassment by a department supervisor, Poss, as well as patently hostile comments by both Poss and the department's operations manager, Moore. *Randolph*, 453 F.3d at 734 (plaintiff "easily satisfied her burden to produce evidence" of a hostile work environment by alleging daily verbal harassment and several incidents of physical activity). These statements were not coded or sugar-coated, but directly chastised Mocic for her decision to carry out her pregnancy while working. In addition to Poss's repeated comments, Mocic's male co-workers also allegedly made "constant comments . . . about her being out of uniform" (Doc. No. 25-5 at 11), a circumstance that SCEMS does not dispute was unavoidable during her pregnancy. The allegedly harassing conduct rose to such a level that other female workers—Meece and Garner—noticed, with Garner testifying that she thought Mocic was singled out within the department. (Doc. Nos. 20-11 at 3–5; 25-5 at 8, 11.) In addition, Garner testified to unrelated comments by male employees disparaging their female co-workers—though Mocic has not established that she herself knew of the harassment. (Doc. No. 25-2 at 8, 12–15.) *See Jackson v. Quanex Corp.*, 191 F.3d 647, 661–62 (6th Cir. 1999) (qualifying harassment under a hostile work environment claim can include "second-hand" harassment to employees other than the plaintiff.)

Ultimately, not only did Mocic consider the comments and conduct problematic—as she told at least one supervisor and one co-worker (Doc. Nos. 20-10 at 3; 20-11 at 3)—but the Court also finds a reasonable person in her position would consider the conduct sufficiently pervasive as to alter her conditions of employment and to create an abusive working environment. *Harris*, 510 U.S. at 21. Thus, the Court finds that, together, these incidents raise a genuine issue of

material fact as to whether SCEMS created a hostile work environment, such that Mocic's first Title VII claim should survive summary judgment.

> B. *Uniform Policy*

Mocic next alleges SCEMS violated Title VII by refusing to order her a larger uniform or to allow her to deviate from its uniform policy during her pregnancy. (Doc. No. 1 ¶ 21.) SCEMS argues that the Court must analyze Mocic's uniform policy claim—which she pled distinctly from the hostile work environment claim (Doc. No. 1 ¶ 21)—as an "adverse action" sex discrimination claim. (Doc. No. 20 at 11–12.) The claim fails, SCEMS argues, because Mocic "makes no attempt to allege" and presents no evidence "that she suffered an adverse employment action," as required. (*Id.* at 12.) Mocic appears to concede this, as she does not address any of SCEMS's arguments in her Response. (Doc. No. 25.)

To establish a prima facie case of gender discrimination under an adverse action theory, "a plaintiff must show that she was (1) a member of the protected class, (2) subject to an adverse employment action, (3) qualified for the job, and (4) treated differently than similarly situated male employees for the same or similar conduct." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (citation omitted). The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms or conditions of . . . employment because of the employer's conduct." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (citation and quotation marks omitted). Sufficiently adverse employment actions include termination of employment, failure to promote, demotion with a decreased salary, wages or less distinguished title, reassignment with significantly different responsibilities, or material loss of benefits. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). However, the Sixth Circuit has held that de minimis employment actions—such as temporary actions or reassignments without changes in

salary, benefits, title, or work hours—do not constitute adverse employment actions. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Similarly, the Circuit has stated in unpublished opinions that a verbal reprimand, without evidence that it is more than criticism, does not constitute an adverse employment action. *Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708 (6th Cir. 2004); *Nickell v. Memphis Light, Gas & Water Div.*, 76 F. App'x 87, 93 (6th Cir. 2003).

Here, the Court finds Mocic has not shown sufficient evidence for this claim—properly analyzed under the adverse action line of cases—to survive summary judgment. As SCEMS effectively argues, Mocic has not alleged nor shown proof that she suffered a sufficiently adverse employment action based on the department's refusal to order her a new uniform or to sanction her untucked shirt. At most, Mocic has set forth evidence that the supervisor in charge of uniforms, Poss, verbally reprimanded her and threatened to "write [her] up." (Doc. Nos. 20-1 at 7; 25-5 at 4.) But, she has not alleged Poss followed through and issued a formal reprimand that led to changes in the terms of her employment, such as changes in her wages, assignments, or work hours. Nor has she alleged that SCEMS's denial of light duty work—which, as discussed below, required her to take a leave from work—or her termination were related to the uniform issue. Without more, the Court finds the verbal reprimands here insufficient to constitute an adverse employment action, and Mocic's second Title VII claim fails as a matter of law. Thus, summary judgment is **GRANTED** as to this claim.

C.      *Light Duty*

In her third sex discrimination claim under Title VII and her first THRA claim, Mocic alleges SCEMS refused to provide her with a light duty option in lieu of a leave of absence or later termination when she suffered a workplace injury, while it offered light duty work to similarly situated males. (Doc. No. 1 ¶ 21.) SCEMS argues that no similarly situated males

existed and, even if two male employees were considered similarly situated, SCEMS did not

offer them light duty work. (Doc. No. 20 at 14–17.) Mocic disputes this, arguing she has

identified at least one similarly situated male for whom SCEMS created light duty work. (Doc.

No. 25 at 12–15.)

To establish a prima facie case of disparate treatment under Title VII, a plaintiff must set

forth (1) that she is a member of a protected group, (2) that she was subject to an adverse

employment decision, (3) that she was qualified for the position, and (4) that similarly situated

non-protected employees were treated more favorably. *Clayton v. Meijer, Inc.*, 281 F.3d 605,

610 (6th Cir. 2002). Here, SCEMS challenges only the fourth factor.

In examining whether a plaintiff has properly identified similarly situated employees,

"courts should not demand exact correlation, but should instead seek relevant similarity"

between the plaintiff and the others. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)

(citation omitted). In the light duty work context, the Sixth Circuit has held that relevant factors

include "the expected duration of disability" and whether other employees faced similar work

restrictions. *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 732 (6th Cir. 2000).

Here, SCEMS has set forth evidence that—even if other male employees were similarly

situated to Mocic—it did not treat them more favorably because it had a consistent policy to

provide light duty work only when "enough administrative work [existed] to warrant the payroll

cost," and that none existed between August and October 2010 when Mocic injured her shoulder

on the job. (Doc. No. 20-5 ¶¶ 3–5.) Mocic has not presented evidence to dispute these

statements that no light duty work was available during these months. Instead, Mocic argues in

her Response that "Defendant is known to have *created* light duty work for a male ambulance

crew member who, like Mocic, was unable to lift patients due to an injury." (Doc. No. 25 at 13

(emphasis in original).)

Had Mocic shown evidence supporting such a statement, she likely would have met her burden in raising a genuine dispute at this stage. However, the record falls far short of doing so. As support, Mocic cites only a deposition by Brett Gregory, a co-worker, who testified that

> We had a gentleman paint our railing on the front of our station. Didn't know until afterwards that he had gotten hired. He had broke [sic] his arm in an accident outside of work and he painted our front porch. That's all I know. . . . He was being hired to work on the ambulance and he got hurt before he could start.

(Doc. No. 20-6 at 8.) In other words, Gregory testified only that SCEMS gave an ambulance worker a task outside of his regular duties after the worker injured himself in such a way that he presumably could not lift patients. The Court has found no mention of a porch-painting worker in any of the other deposition excerpts provided.

While the nature of the unnamed ambulance worker's restriction might parallel Mocic's, Gregory's testimony does not set forth the duration of the worker's disability on the job, such that Mocic has not established that she and the worker were similarly situated under *Hoskins*. Mocic took a two-month leave of absence in 2010 following her injury and, though she does not claim she required light duty at the time of her termination, might have required a similar amount of it again in November 2010 from Defendants' perspective. (Docs. Nos. 20-1 at 19, 21–22, 25–27; 20-4 at 6; 20-7 at 6.) By contrast, Gregory's statement establishes only that the unnamed worker painted a porch for an unspecified amount of time, which likely did not last several months. Perhaps more to the point, Gregory did not state—and there is no other evidence—that the painting task was *created* to give the worker an assignment when no light duty work was otherwise available; rather, the origins of the painting work and its relation to SCEMS's non-ambulance-related needs at the time are unexplained by the testimony.

As a result, the Court finds Gregory's testimony alone does not raise a genuine dispute as to whether SCEMS treated Mocic less favorably than similarly situated males. Thus, Mocic has

not established a prima facie case of sex discrimination based on her light duty claims under Title VII and the THRA, and summary judgment is **GRANTED** as to these claims.

### D.    Retaliation

In her final Title VII and THRA claims, Mocic alleges SCEMS denied her light duty work and terminated her employment in retaliation after she filed a discrimination charge with the EEOC.  (Doc. No. 1 ¶¶ 25–30.)  SCEMS appears to concede that Mocic has made a prima facie showing of retaliation.  (Doc. No. 20 at 17.)  Instead, it argues that it had a legitimate, nondiscriminatory reason for dismissing Mocic and that Mocic has not set forth sufficient evidence to raise a genuine dispute over whether SCEMS's reason was pretext for her termination.  (*Id.* at 17–18.)  In response, Mocic outlines the evidence raising questions over the legitimacy of SCEMS's proffered reason.  (Doc. No. 25 at 16–17.)

To make a prima facie showing of retaliation under Title VII, a plaintiff must set forth that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant afterward took adverse employment action against the plaintiff ; and (4) a causal connection existed between the protected activity and the adverse employment action.  *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). Here, the Court finds Mocic has set forth a prima facie case of retaliation.  It is undisputed that Mocic engaged in protected activity by filing a discrimination claim in January 2010 with the EEOC (Doc. No. 20-1 at 30) and that SCEMS supervisors knew of the charge filed (Doc. Nos. 20-2 at 12; 25-3 at 16; 25-4 at 6).  SCEMS took adverse employment action against Mocic by terminating her employment.  (Doc. No. 20-1 at 35.)  Finally, an inference of a casual connection exists, as SCEMS terminated Mocic within months of her filing an EEOC charge solely on the basis of an alleged comment she made regarding her capacity to lift patients unassisted.  *See Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007) ("all the plaintiff must do is put forth some

credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.").

Once a plaintiff "has established a prima facie case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Morris*, 201 F.3d at 793 (citation omitted). If an employer offers such a reason, the burden of production then shifts to the plaintiff—who bears the burden of persuasion throughout the entire process—to demonstrate "that the proffered reason was not the true reason for the employment decision," but was mere pretext. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). The Sixth Circuit has held that a plaintiff generally can show pretext in any of three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted). These three categories serve to marshal evidence on the ultimate inquiry of whether "the employer fire[d] the employee for the stated reason or not." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citation omitted).

However, under the first method, if "an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately show to be incorrect." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted). An employer has an honest belief in its rationale when it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* To overcome an employer's honest belief defense and show pretext, a plaintiff must produce sufficient evidence such that a reasonable jury could reject the employer's explanation and infer that the employer did not honestly believe in it. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001).

Here, SCEMS argues that it had a legitimate and nondiscriminatory reason to terminate Mocic: Patrick's report to Moore that Mocic was unable to perform the functions of her position because she would require lift assistance on every call, a requirement that Douglas deemed inefficient and grounds for termination. (Doc. No. 20 at 17–18.) However, the Court finds Mocic has raised genuine issues of material fact regarding the legitimacy of SCEMS's proffered reason.

1.      No Basis in Fact and Adequacy of the Investigation

First, Mocic has set forth evidence that raises a genuine dispute as to whether SCEMS's proffered reason has "no basis in fact." For this argument, Mocic focuses on evidence disputing the underlying report by Patrick: her sworn statement that she did not tell Patrick she would require lift assistance on every call, and a witness's testimony that Mocic told Moore at her termination meeting that she did not need the lift assistance.[3] (Doc. Nos. 25 at 16; 25-9 ¶ 5–6.) These arguments aside, the Court finds the record includes sufficient evidence to raise a genuine dispute over the adequacy of SCEMS's investigation so as to overcome its honest belief defense.

An "employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary process." *Tingle*, 692 F.3d at 531. An employer's investigation need not be "optimal or that it [leave] no stone unturned"; rather, the "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (citation omitted). Ultimately, a court should not grant summary judgment if an employee raises a dispute of material fact such that a reasonable jury could find the decision-making process "unworthy of

---

[3] The Court notes that Mocic's Response states that Sean Frary, an SCEMS employee or supervisor who attended the termination meeting (Doc. No. 25-3 at 8), testified at deposition that Mocic told Moore in the meeting that she did not require lift assistance. However, the record contains no deposition of Frary.

credence." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 288 (6th Cir. 2012) (citation omitted).

In *Seeger*, the Sixth Circuit upheld the granting of summary judgment on an employee's FMLA retaliation claim, after the plaintiff's employer terminated him based on co-worker reports indicating he had committed fraud. Finding the employer's investigation "thorough," the court stated that the employer had interviewed and taken formal statements from two co-workers, had scrutinized the employee's medical records, discussed the complaint with him and "before concluding [its] inquiry, gave him the opportunity to submit additional relevant information." *Seeger*, 681 F.3d at 287. Similarly, in *Tingle v. Arbors at Hilliard*, the Sixth Circuit held an employer "undertook a reasonable investigation" when its manager followed up on a complaint against an employee by interviewing witnesses and discussing the incident with the employee before issuing the formal complaint. 692 F.3d at 532.

By contrast, in *Martin v. Toledo Cardiology Consultants, Inc.*, the Sixth Circuit held that an employee had produced sufficient evidence to place at issue whether her employer made a reasonably informed decision, after he fired her over a letter she had written without giving her "'a chance to say much of anything'" to explain herself. 548 F.3d 405, 414 (6th Cir. 2008). The employer later argued that he based the employee's termination also on an alleged racial slur she made, however, the court again determined that a genuine dispute existed over the sufficiency of the investigation into the slur, as the employer had not interviewed all witnesses and had collected a statement only from one of his favorite workers. *Id.* at 414–15.

Here, the Court finds Mocic has raised a genuine dispute over the adequacy of SCEMS's investigation, such that a reasonable jury could find SCEMS's decision-making process "unworthy of credence" and conclude that SCEMS did not make a "reasonably informed and considered" decision based on the facts before it at the time. It is undisputed that SCEMS fired

Mocic on the basis of her one comment to Patrick. The Court finds significant evidence in the record indicates that Moore conducted scarcely any investigation into what transpired between Patrick and Mocic, and no investigation into whether Mocic would actually require routine lift assistance, as she supposedly told Patrick. Asked to describe the "whole scenario" of Mocic's termination, Moore testified that Patrick reported the incident to him, and that he then contacted Douglas and SCEMS's legal counsel, before bringing Mocic in for a termination hearing. (Doc. No. 20-4 at 5.)

The apparent extent of Moore's inaction is striking. It appears he did not thoroughly interview Patrick at the time of the initial report or after (*see* Doc. No. 20-7 at 7–9), and he testified that he did not even ask Patrick why Mocic said she would be unable to lift patients properly (Doc. No. 25-3 at 12). He nonetheless typed a letter or memorandum for Patrick to sign regarding the incident. (*Id.* at 12.) Nor did Moore provide Mocic with an opportunity to explain herself before making his decision. Moore testified that he never asked Mocic why she needed lift assistance because he already "had all the information from Dwayne Patrick." (Doc. No. 25-3 at 11 ("It's [Patrick's] job to deal with his employees. I expect him to do his job so that I can therefore have the information I needed to do my job.").) Moore also testified that he had typed a letter confirming the termination before Mocic's termination meeting and explicitly stated in the letter that no further discussion would be permitted. (*Id.* at 13.) He testified that, at the meeting, "[a]s she . . . answered yes to the question about the statement that she made to Dwayne Patrick, . . . [he] had no intentions of letting her make any comments." (*Id.* at 14.) He explained that this "no comment" stance had come at the advice of SCEMS's legal counsel. (*Id.* at 14.) Thus, sufficient evidence exists to suggest Moore conducted a deliberately thwarted and one-sided investigation, relying solely on Patrick's unsubstantiated report.

Nonetheless, SCEMS argues that it had an honest belief in its proffered reason because Douglas—who claims ultimate authority to terminate employees—relied on and believed the statement made by Patrick. (Doc. No. 20 at 18.) However, rather than inoculating SCEMS, the Court finds that Douglas's statement that he made the ultimate decision may only compound the insufficiency of SCEMS's investigation and the apparent paucity of the factual foundation for the termination. Like Moore before him, Douglas admitted that he did not speak with Mocic before "allowing" Moore to fire her. (Doc. No. 20-2 at 11–12.) He also testified that he relied exclusively on Moore's report of the incident and Moore's recommendation to terminate Mocic's employment, even though he knew Moore had been previously named in Mocic's EEOC charge.[4] (*Id.*) *See Goller v. Ohio Dep't of Rehab. and Corr.*, 285 F. App'x 250, 258 (6th Cir. 2008) (holding a genuine dispute over the adequacy of an employer's investigation existed where the employee's manager relied on a report by a supervisor whom the employee had previously reported for racial animus). Asked point blank if he was "just getting Mr. Moore's version" of the incident between Mocic and Patrick in making his decision, Douglas answered: "Correct, yes." (Doc. No. 20-2 at 11.) Given this reliance on Moore's "investigation," the fact that Douglas operated at one level removed from the investigation alone does not alter its inadequacy. *Cf. Wilson v. Stroh Co., Inc.*, 952 F.2d 942, 946 (6th Cir. 1992) (holding a direct supervisor's animus is not imputed to a manager who made the ultimate termination decision based on the manager's *independent* investigation).

---

[4] In its Motion, SCEMS describes Douglas's decision as based on Patrick's statement, rather than on Moore's summary of the incident and recommendation to terminate. (Doc. No. 20 at 18–19.) This is an overstatement. Douglas repeatedly maintained at deposition that Moore alone provided him with the information of the incident. (Doc. No. 20-2 at 5–6, 11–12.) At most, Douglas testified that Patrick "was present when Mr. Moore was presenting this information to me," but he left unsaid whether Patrick spoke at the meeting. (*Id.* at 12.)

## 2. Insufficient Motivation for Employer's Action

In addition, the Court finds Mocic has shown evidence to raise a genuine dispute of fact as to whether SCEMS's stated reasons for her dismissal sufficed to motivate its action. *Chen*, 580 F.3d at 400. Douglas testified that requiring lift assistance on every call—even for a few days—was grounds for termination because this would impermissibly require SCEMS to deploy a third employee in ambulances, as help from other departments is never guaranteed. (Doc. No. 20-2 at 8, 10.) Otherwise, Douglas testified, a crew could find itself in an emergency situation with a dying patient and no means to lift the patient in a timely manner. (*Id.* at 10.) However, as Mocic argues in her Response, she did not require lift assistance on every call, and the BLS division does not handle emergency calls, which are reserved for the ALS division. (Doc. Nos. 25 at 16–17; 25-5 at 30; 25-9 ¶ 5.) Even if called to an accident scene, as Garner testified, the BLS ambulance would not serve as "the primary truck," because BLS ambulances are not staffed by paramedics and would not be properly stocked. (Doc. No. 25-5 at 9.) And when serving an emergency with other first responders, a BLS crew could ask other on-site workers for lift assistance, rather than seeking additional deployment. (Doc. No. 25-4 at 10.)

In addition, Mocic has established that BLS crews regularly request lift assistance when handling obese patients or when they must carry patients up or down many stairs. (Doc. Nos. 25-3 at 9; 25-4 at 8.) Poss estimated that crews call dispatch nine to twelve times per month to request lift assistance. (*Id.* 25-4 at 8–9.) According to Garner, waiting for dispatched lift assistance to arrive does not routinely pose safety problems with BLS calls. (Doc. No. 25-5 at 8–10.) Poss—who had worked for SCEMS for eleven years at the time of his deposition—testified that, to his knowledge, SCEMS had never terminated an employee for requiring lift assistance. (Doc. Nos. 20-3 at 3; 25-4 at 10.) *See Lott v. ICS Merrill*, 483 F. App'x 214, 219 (6th Cir. 2012).

### 3. Actual Motivation

Finally, the Court finds Mocic has shown sufficient evidence of potential animus by Moore that—along with evidence of the faulty investigation and the disputed basis for the termination—raises a genuine issue as to whether SCEMS's proffered reason actually motivated Moore's recommendation. While on maternity leave in January 2010, Mocic filed her EEOC charge against SCEMS, specifically naming Moore and stating that he had made an inappropriate comment related to her pregnancy. (Doc. No. 20-1 at 30.) At deposition, Moore admitted that he had made the comment to Mocic and that he knew she had named him in the EEOC charge, as Douglas had notified him of the charge. (Doc. No. 25-3 at 15–16.) He testified that he knew Mocic complained about the incident to another supervisor, as well. (*Id.* 25-3 at 17.) It is undisputed that Moore's recommendation drove SCEMS's decision to terminate Mocic's employment several months later. As Mocic argues in her Response, Moore's subsequent lapse in the investigation shows he was "wholly indifferent as to whether Mocic actually required lift assist[ance] on all calls." (Doc. No. 25 at 16.) As described above, Moore did not ask Mocic or Patrick to explain why Mocic needed the assistance, nor did he attempt to verify the truth of her comment before he recommended her termination. As he testified, he had no intention of allowing her an opportunity to dispute the complaint before terminating her.

Thus, the Court finds Mocic has shown sufficient evidence of pretext to survive summary judgment on her Title VII and THRA retaliation claims. The Motion is **DENIED** as to these claims.

**IV. CONCLUSION**

For the reasons stated above, the Court **GRANTS** the Motion, as to Mocic's Title VII and THRA sex discrimination claims based on (1) SCEMS's uniform policy and (2) its alleged denial of light duty work. The Court **DENIES** the Motion as to the remaining claims.

It is so ORDERED.

Entered this the ___7th___ day of March, 2013.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT